UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURENCE DEANE COY II,

        Petitioner,

                               CASE NO. 04-CV-73129-DT
  v.                        JUDGE GERALD E. ROSEN
                               MAGISTRATE JUDGE PAUL J. KOMIVES

PAUL RENICO,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITIONER'S APPLICATION FOR THE WRIT OF HABEAS CORPUS

*Table of Contents*

I. BACKGROUND ................................................................ 2
II. LEGAL STANDARD ........................................................... 10
III. DISCUSSION .............................................................. 12
    A.    *DNA Statistical Evidence Claim (Claim I)* ........................ 12
        1.    *Clearly Established Law* .............................. 12
        2.    *The Davis/Frye Standard* ............................. 14
        3.    *The State Court Proceedings* ......................... 15
            a. The First Trial and Appeal ........................ 15
            b. The Second Trial and Appeal ....................... 17
        4.    *Analysis* ............................................ 20
    B.    *Hearsay Evidence Claim (Claim II)* ............................... 24
        1.    *Admission of the Evidence under Rule 803(3)* ......... 24
        2.    *Confrontation Clause* ................................ 26
            a. Clearly Established Law ............................ 26
            b. Analysis .......................................... 27
            c. Impact of Crawford v. Washington .................. 38
    C.    *Right to Present Defense Claims (Claims III & IV)* ................ 41
        1.    *Clearly Established Law* .............................. 42
        2.    *Jordan McKee Testimony (Claim III)* .................. 44
        3.    *DNA Testing of Darnell Riddle (Claim IV)* ........... 46
    D.    *Sentencing Claim (Claim V)* ...................................... 48
        1.    *Clearly Established Law* .............................. 48
        2.    *Analysis* ............................................ 51
IV. ORDER ................................................................... 52

# I. BACKGROUND

Petitioner Laurence Deane Coy, II, is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.  Petitioner was charged in state court with first degree murder, MICH. COMP. LAWS § 750.316.  On December 29, 1998, petitioner was convicted of the lesser offense of second degree murder, MICH. COMP. LAWS § 750.317, following a jury trial in the Calhoun County Circuit Court.  On January 29, 1999, petitioner was sentenced to a term of 40-60 years' imprisonment.  Petitioner appealed as of right to the Michigan Court of Appeals.  On November 17, 2000, the Michigan Court of Appeals reversed petitioner's conviction, concluding that the trial court erred in admitting DNA evidence without accompanying statistical evidence regarding the likelihood of a match between the sample and petitioner.  *See People v. Coy*, 243 Mich. App. 283, 286-314, 620 N.W.2d 888, 891-904 (2000) ("*Coy I*").

Prior to retrial, an evidentiary hearing was held by the trial court to determine the admissibility of statistical evidence concerning the DNA analysis.  The trial court ruled the evidence admissible.   The extensive trial testimony leading to petitioner's conviction was accurately summarized in petitioner's brief on appeal to the Michigan Court of Appeals:

> The prosecution's theory in the case was that Mr. Coy was involved in a sexual relationship with the decedent, Ms. Davidson, and visited her at the apartment she shared with Christina McKee on the night of January 4, 1998.  Ms. McKee left for work early on that evening.  She was permitted to testify, over a defense hearsay objection, that prior to her leaving for work Ms. Davidson asked her to page Mr. Coy, as there was no working phone in the apartment, and remind him that he was supposed to come to the apartment that night.  (T, 8/8 II, 96-98).  She indicated that she was aware of the relationship between Ms. Davidson and Mr. Coy.  Ms. McKee acknowledged that she did not attempt to call or page Mr. Coy as requested, and did not speak to him that evening.  (T, 8/8 II, 99, 163).
>
> Ms. McKee's two young sons, Joshua and Jordan, along with Ms. Davidson's son, were at the apartment with Ms. Davidson when Ms. McKee left for work.  She testified that while at work, she was called by her brother, Darnell Riddle, and asked by him to take him shopping after they both got off work (he worked at a different

2

location) for sheets for his new bed.  (T, 8/8 II, 100).  Ms. McKee testified she initially refused to do so, since she did not get off work until very late at night, but later decided to take him to a store and picked him up at his residence, and then went to a store.  (T, 8/8 II, 102-105).  A store surveillance video was introduced at trial showing Ms. McKee and Mr. Riddle at the store at approximately 2:45 am.

Ms. McKee testified that when she returned home to the apartment, at approximately 3:30 am on the 5th, she became concerned because the front door to the apartment was unlocked.  (T, 8/8 II, 108).  She stated she went inside and first checked on the children, who were fine, and then went to Ms. Davidson's bedroom. There she saw Ms. Davidson's body lying on the floor, with a considerable amount of blood on the body and in parts of the room.  (T, 8/8 II, 112-116).  Ms. McKee then took the children from the apartment and had a neighbor call the police.

Ms. McKee testified that when she got home that night she noticed a set of headphones connected to the stereo, and indicated that the headphones were ones Mr. Coy had brought to the apartment because neighbors had complained about loud music.  (T, 8/8 II, 110-111).  She also testified that there was an ashtray containing the remains of a marijuana cigarette, evidence of incense having been burned, and ashtrays with Newport and Newport Light cigarette butts.  (T, 8/8 II, 120-128, 174-176).  According to McKee, none of these items were there when she left for work. She asserted that Mr. Coy would smoke marijuana at the apartment, and had previously burned incense there (T, 8/8 II, 123-127).  She agreed, however, that she told the police that neither Mr. Coy nor Ms. Davidson smoked cigarettes.  (T, 8/9 I, 10-11).  Ms. McKee later acknowledged that after the death she did use Ms. Davidson's identification to attempt to get cable service.  (T, 8/9 I, 4).

Ms. McKee stated that when she first spoke to the police, she gave them the names of Andre Settler, a maintenance man at the apartment complex, and Kareem Thrash (who was the father of Ms. Davidson's child), along with several other men, as possible suspects in the case, but did not mention Mr. Coy.  (T, 8/8/ II, 138; 8/9 I, 14-16).  She indicated that Mr. Settler had come to their apartment several times without notice or being invited, that Ms. Davidson had referred to him as the "maintenance man from Hell," and that he had gotten upset at one time because Ms. Davidson was with Mr. Coy.  (T, 8/8 II, 188-189).  Ms. McKee testified that during the morning of the 5th, after she spoke to the police, she went to see Mr. Coy where he was working and told him of Ms. Davidson's death.  According to the witness, when she asked him if he had come over to the apartment the prior night, he stated that he had not and that he had been stranded at his sister's house.  (T, 8/8 II, 135-136).  However, during the cross-examination when shown a record of her interview with the police on January 12, she acknowledged that she only assumed he had been at his sister's house, and admitted he had not said that to her.  (T, 8/9 I, 20).  Ms. McKee testified she did not recall seeing any cuts on Mr. Coy's hands, or bandages, when she spoke to him on the 5th.  (T, 8/8 II, 164).

The medical examiner testified that Ms. Davidson died from several stab wounds to the back.  (T, 8/14 II, 76-77).  The body showed evidence of numerous stab wounds, some of which were characterized by the medical examiner as

defensive wounds, and evidence of bruising on the face.  There was no physical evidence of any forced sexual penetration. (T, 8/14 II, 97-98).  When shown a knife blade that was found by the police on Ms. Davidson's bed, the doctor was of the opinion that this knife could have caused the stab wounds. (T, 8/14 II, 58-59).  The toxicology report on the body showed evidence that Ms. Davidson had recently ingested marijuana. (T, 8/14 II, 98-100).  He could not determine the time of death to any degree of certainty. (T, 8/14 II, 109-110).

The prosecution presented a great deal of testimony from police officers and emergency personnel who responded to the apartment.  There was no evidence of any forced entry into the apartment.  A sliding door to a balcony was found open, but no footprints or other evidence was found either outside the balcony or on the porch indicating that someone had entered the apartment through that door (it was raining and the ground was wet that night). (T, 8/16 I, 28-30).  A knife block containing a set of steak knifes very similar to the handleless blade found on the bed was located in the kitchen, with some of the slots for knives being empty.  Samples of blood stains were collected from various items in the apartment, most significantly from the knife blade on the bed and from a door handle to Ms. Davidson's bedroom.  Those samples were submitted for analysis.  No fingerprints identifiable as coming from Mr. Coy were found anywhere in the apartment. (T, 8/10 II, 27, 34-34).  The police located what they believed were blood stains on the outside door to the apartment building.  Later, they searched through Ms. Davidson's car, which Ms. McKee had been driving on the night of the offense, and saw indications of possible blood stains on one of the floor mats of the car.  All of the car's floor mats had been put into the trunk of the car.  Neither the marijuana cigarette butt or the regular cigarette butts were ever tested for the possibility of DNA from saliva.  The police never sought a warrant to search Mr. Coy's residence for clothing he would have been wearing that night to see if it had any blood stains.

The police were told by Ms. McKee of potential suspects in the case, including a man named Andre Settler, who lived in a different building in the apartment complex. (T, 8/17, 21).  When the police went to check on him that night, they noticed what appeared to be a blood stain on the outside of the building, but did not collect any of that stain for analysis due to the officer's opinion that the stain was too dry to have been put on the building that night. (T, 8/17, 21-22).  Mr. Settler and his girlfriend were spoken to by the police that night, their apartment was searched, and marijuana was located hidden in his apartment, but he was not arrested. (T, 8/17, 22-24, 50-51).  In the apartment the police found cigarettes of the same brands that were found in the ashtray at Ms. Davidson's apartment. (T, 8/17, 52).

During the autopsy the medical examiner took slides from Ms. Davidson's vagina which later were found to contain sperm cells.  The expert witnesses differed on how long such cells could have survived within Ms. Davidson in the condition they were found, with the medical examiner testif[ying] he had found such cells in a body after 19 to 20 days. (T, 8/14 II, 107-108).

The prosecution was permitted to call Jordan and Joshua McKee as witnesses at the trial.  Neither boy had testified at the initial trial.  Prior to the selection of the

4

jury, the defense moved for an adjournment, or in the alternative for an order barring testimony from Jordan, on the grounds that the defense had been unable to locate a witness named Pam Perry to testify as an impeachment witness.  (T, 8/7, 3-6). According to the defense, Ms. Perry had been a neighbor of Ms. Davidson and Ms. McKee in 1998, and had overheard Jordan, on the night of the offense, tell family members that his "daddy" could have committed the offense.[2] (T, 8/7, 16-17).  Ms. Perry also did not testify at the initial trial, as defense counsel pointed out her only relevant testimony would be to this statement and since Jordan, who was four years old in 1998, did not testify at that trial, there was no grounds to call for her potential impeachment.  After taking the request to adjourn under advisement, and ordering the prosecution to assist the defense in seeking to locate and subpoena Ms. Perry for this trial, and at several points hearing of the efforts made to locate here, Judge Sindt denied the defense motions either to strike Jordan's testimony or grant a mistrial.  (T, 8/7, 21-25, 45-46; 8/8 II, 3-4; 8/9 II, 25-26; 8/22, 3-13).

> [2]There was no evidence at the trial that Mr. Coy was the father of Jordan or Joshua.

Jordan testified that he heard and saw a man come to the apartment that night, and heard Ms. Davidson screaming.  According to Jordan, he could identify the man as Mr. Coy, primarily due to the black coat with a circle on the back the man was wearing, which he said was the same jacket Mr. Coy had been wearing during a visit to the apartment earlier that day.  (T 8/9 II, 33-36).  Jordan also testified that the man arrived at the apartment at around 8:00pm, just as he was going to bed.  (T, 8/9 II, 39).  He agreed that he had not seen anyone's face that night.  (T, 8/9 II, 43).  Joshua, who is four years older than Jordan, also testified at the retrial, but had no real memory of that night, and did not make any identification.  (T, 8/16 II, 67-72).

A police detective later testified that while Ms. McKee initially gave her a list of possible suspects in the case, including Mr. Settler and Kareem Thrash, who is the father of Ms. Davidson's child, she did not place Mr. Coy on that list and never told the officer that her son had identified Mr. Coy as being in the apartment that night. (T, 8/17, 61, 69-70).  Ms. [McKee] first mentioned Mr. Coy as a suspect several days after the incident.  When Jordan was interviewed by the police in January, 1998, he did not identify Mr. Coy has having been in the apartment.  (T, 8/17, 69).

The DNA comparison testing evidence came in during the testimony of Megan Clement from Lab Corp.  The sperm cells taken from Ms. Davidson were found to be consistent with the profile of Mr. Coy's DNA, with the witness indicating that there was a 1 in 543,000,000 chance of an African-American male being slected at random and matching this profile.[3] (T, 8/15 I, 13-19).  In regards to the mixed samples found on the knife, the witness testified that neither Ms. Davidson nor Mr. Coy could be excluded as possible sources of the mixed DNA in these samples, and that there was a 1 in 1210 chance in the African-American population that a random person would be included within the group who could have contributed a portion of the DNA, that this meant that 99.17 percent of the African-

American population would be excluded, and that the ratio on the likelihood that the mixed sample came from Ms. Davidson and Mr. Coy as compared to Ms. Davidson and a random individual was 164,000 times, based on the African-American population. (T, 8/15 I, 26-35, 44-50). As to the mixed sample from the door knob, the results were based on only a partial profile, as that sample did not have sufficiently reportable results on the same number of loci on the DNA. (T, 8/15 I, 38-39). For that sample, the probability of inclusion as to the African-American population was 1 in 319, and the likelihood ratio was 3100 times (T, 8/15 I, 42-48). Ms. Clement testified that comparison of the known samples obtained from Christina McKee, Andre Settler, and Kareem Thrash excluded all of the them [sic] as possible sources of the mixed DNA samples.[4] (T, 8/15 I, 53, 58-63). The witness acknowledged that it could not be proven that the DNA alleged to be that of Mr. Coy was deposited by way of his blood, as compared to any other source of his DNA (skin cells, saliva, etc.). (T, 8/15 II, 9).

> [3]The DNA comparison evidence concerning the sperm cells was presented at the initial trial, and was not the subject of the later appellate reversal, as this statistical evidence was presented at that trial. . . . There was no issue raised at the retrial concerning the admissibility of this portion of the DNA evidence.

> [4]There was no testimony concerning any analysis of a blood sample from Darnell Riddle. Prior to the trial the defense moved to adjourn the trial so that testing of a sample from Mr. Riddle could be completed, as was done with the samples from Ms. McKee, Mr. Settler, and Mr. Thrash. That motion was denied by the court. (T, 8/7, 28-50).

Evidence was presented that when Mr. Coy was first questioned by the police on the afternoon of January 7, 1998, he had two cuts on his right hand. The prosecution asserted to the jury that Mr. Coy cut himself with the knife blade while stabbing Ms. Davidson, resulting in his blood as well as hers being on the knife and door knob and explaining his DNA in the mixed sample on those items. The prosecution presented testimony form Dr. Thomas Maier, who treated Mr. Coy for the cuts to his hand at the emergency room on January 6, at around 5:30 pm. (T, 8/16 I, 9). Mr. Coy told the doctor he had cut his hand on some broken glass. (T, 8/16 I, 11). Dr. Maier testified that the cuts could have been made with a knife, but also could have been caused by any sharp object, including broken glass. (T, 8/16, 12, 16). He further testified that the cuts appeared to him to be fresh, that he probably would not have sutured the wounds, which he did, had they appeared to him to have been more than 12 hours old, and acknowledged at the first trial stating they appeared to be no older than 24 hours. (T, 8/16 I, 12, 15-17).

The principal defense theory in the case was alibi. Mr. Coy is the father of two children with a woman named Camille Napilot, who on that date lived in a

different building in the same apartment complex as Ms. Davidson. He testified that he commonly would babysit with his children while their mother was at work. On Sunday, January 4, he went to Ms. Napilot's apartment around 11:00 in the morning to babysit while she worked. (T, 8/21 I, 109). He took the children downstairs to Ms. Napilot's parents' apartment for most of the day, watching football games with her father. Ms. Napilot arrived home after work, and Defendant stayed briefly at her apartment talking with her until he left at around 9:45 pm to walk to where he was then living, which was several miles away. (T, 8/21 I, 109-111).

Mr. Coy admitted that he had been in a sexual relationship with Ms. Davidson, and would at times stop by her apartment after babysitting for his children. He stated that if the lights were on in her apartment when he left Ms. Napilot's, he would on occasion stop by to see Ms. Davidson. (T, 8/21 I, 111-113, 114). On January 4, however, as he walked through the parking lot he looked up at Ms. Davidson's apartment, and seeing that the lights were off proceeded on to go home, arriving home around 10:30 or 10:45 pm. (T, 8/21 I, 112-113). He denied he had any prior intent to stop in to see Ms. Davidson after he was through babysitting on the 4th. (T, 8/21 I, 112). He testified he spoke to the woman with whom he was then living, Melissa Lewis, and later went to see her mother, and then they went to sleep. (T, 8/21 I, 117-118). He and Ms. Lewis woke up at around 3:00 am to go to work. They both worked at the Franklin Neighborhood Center. (T, 8/21 I, 119). While at work that day part of his job was to wash dishes using bleach. He denied that his hand was cut when he was at work on the 4th, stating that had he had the cuts it would have been very uncomfortable to do his job given the use of bleach.

Mr. Coy testified he first heard about Ms. Davidson's death the next day, when Ms. McKee told him. (T, 8/21 I, 122). He agreed he had been in Ms. Davidson's apartment and in her bedroom in the past, and that he had probably touched many things in the apartment, including her silverware. (T, 8/21 I, 119-120). He denied that he smokes cigarettes. (T, 8/21 I, 120).

On the 6th, he had an appointment with his probation officer at around 3:00 pm.[5] While at that appointment he had to submit a urine test for the presence of controlled substances. (T, 8/21 I, 123-126).

> [5]Evidence was presented at trial that Mr. Coy was on probation on January 4, 1998. The presentence report in the case . . . shows he was on probation for convictions for carrying a concealed weapon and attempted carrying a concealed weapon.

He testified that after his appointment he returned home, and was cleaning out an old car of his when he cut his hand on some broken glass that was in a trash barrel he was using. (T, 8/21 I, 126-128). He got Ms. Lewis's sister to drive him to the emergency room for treatment of these cuts, as he did not have a working car.

Mr. Coy admitted that when he was interviewed by the police he told them he had only engaged in oral sex with Ms. Davidson, rather than any vaginal intercourse, explaining that he did not want either Ms. Lewis or Ms. Napilot to

discover that he had been having intercourse with Ms. Davidson. (T, 8/21 I, 115-116). He stated he had last had intercourse with Ms. Davidson on the Thursday of that week. (T, 8/21 I, 115). He had been to the apartment on Friday, and admitted people were smoking marijuana at the apartment that night, but denied he had engaged in any of the smoking. (T, 8/21 I, 117). He denied owning a black coat with a circle on the back). (T, 8/21 I, 132-133).

Mr. Coy denied killing Ms. Davidson, or having any knowledge of who committed the offense. (T, 8/21 I, 109). When he was interviewed by the police on January 7, he volunteered to give them a blood sample if they wanted, and they checked him for any scratches or bruises on his body, finding none. (T, 8/21 I, 131-132, 135).

Mr. Coy's testimony was corroborated by several defense witnesses. Ms. Napilot and her parents, Richard and Leah Holloway, testified that he was babysitting on the 4th, that he was at her parent's [sic] apartment until around 9:45 pm, and that he then left to walk home. (T, 8/21 I, 12-22, 37-41, 43-45). Ms. Lewis testified that he arrived home around 10:45 pm, went with her briefly to visit her mother, and they then went to bed. (T, 8/21 I, 50-53). She stated Defendant was acting normally when he got home that night, and did not have any cuts on his hands. (T, 8/21 I, 51). Ms. Lewis stated Defendant was wearing a red and white coat that day. (T, 8/21 I, 63). They woke up at 3:00 am to go to their jobs at the Franklin Center. (T, 8/21 I, 53).

Ms. Lewis testified that her brother, Terry Lewis, is the father of Jordan McKee. (T, 8/21 I, 59). She indicated that the day after Ms. Davidson's death she spoke with Jordan, and he told her that a man who "stayed with my mom" killed Ms. Davidson, and that the man had covered himself up at the time. (T, 8/21 I, 60). She stated that Jordan could not give her any name for that man. (T, 8/21 I, 60).

Steven Blanchard, Mr. Coy's probation officer, testified that at the appointment on the 6th he did not see any cuts on Mr. Coy's hands, and that his urine drop test for controlled substances was clean. (T, 8/17, 4-6). He stated that this test would have picked up the presence of marijuana afterproducts in Mr. Coy's urine had he smoked marijuana on the 4th. (T, 8/17, 6).

Pam Palmer, Mr. Coy's supervisor at his job, testified that he did work on the 5th, did wash dishes, and was not wearing any gloves. She stated she did not see any cuts on his hand, nor did she believe he could have washed the dishes without significant pain had his hand been cut. (T, 8/15, 17-21). Similar testimony was presented from a co-worker, Wendelle White.

Rosie and Elizabeth Lewis testified they were in the area when Mr. Coy cut his hand on the broken glass, and saw that the wounds were bleeding at that time. (T, 8/21 I, 88-91, 95-96). Rosie Lewis drove him to [the] hospital after they wrapped his hand in a towel to stop the flow of blood. (T, 8/21 I, 90).

In addition to these witnesses, the defense presented testimony from Emily Whitehead, Darnell Riddle's parole officer, who indicated that Mr. Riddle was then on parole from a conviction for assault with intent to do great bodily harm, that he tested positive for the use of marijuana on January 13, 1998, and that he later

absconded from his parole.  (T, 8/21 I, 81-83).

  The jury deliberated in the case over five days (August 22, 23, 24, 27, 28).
They returned to court on the 27th, indicating they were deadlocked.  Judge Sindt
reinstructed the jury on the process of deliberations, and ordered them to attempt to
reach a verdict.  (T, 8/27, 3-5).  The jury returned the guilty verdict on the included
offense of voluntary manslaughter at 4:49 pm on the 28th.  (T 8/28, 3).

Def.-Appellant's Br. on Appeal, in *People v. Coy*, No. 238112 (Mich. Ct. App.), at 3-14.

  On August 28, 2001, petitioner was convicted by the jury of the lesser included offense of

voluntary manslaughter, MICH. COMP. LAWS § 750.321.  On October 8, 2001, petitioner was

sentenced as a third habitual offender, MICH. COMP. LAWS § 769.11, to a term of 20-30 years'

imprisonment.

  Following his conviction, petitioner appealed as of right to the Michigan Court of Appeals

raising, through counsel, the following claims:

  I.  THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING THE
DEFENSE MOTION TO SUPPRESS THE RESULTS OF DNA TESTING
OF THE MIXED SAMPLES, AS THE STATISTICAL ANALYSIS
EVIDENCE WAS NOT SHOWN TO BE SUFFICIENTLY RELIABLE TO
PRESENT TO THE JURY.

  II.  DEFENDANT WAS DENIED A FAIR TRIAL WHERE THE TRIAL
COURT, OVER A TIMELY DEFENSE OBJECTION, PERMITTED
CHRISTINA McKEE TO TESTIFY TO AN ALLEGED OUT-OF-COURT
STATEMENT OF JENNIFER DAVIDSON UNDER THE STATE OF
MIND EXCEPTION OF MRE 803(3), WHERE MS. DAVIDSON'S STATE
OF MIND WAS NOT RELEVANT AND WHERE THE PROSECUTOR
THEN USED THE STATEMENT AS SUBSTANTIVE PROOF OF MR.
COY'S INTENT.

  III.  THE TRIAL COURT REVERSIBLY ERRED IN OVERRULING THE
DEFENSE MOTIONS TO EITHER BAR THE TESTIMONY OF JORDAN
McKEE OR FOR MISTRIAL WHERE THE DEFENSE WAS UNABLE TO
LOCATE A WITNESS FOR THE RETRIAL THAT COULD HAVE
TESTIFIED TO A PRIOR INCONSISTENT STATEMENT FROM
JORDAN McKEE.

  IV.  THE TRIAL COURT REVERSIBLY ERRED IN DENYING THE

DEFENSE MOTION TO ADJOURN THE TRIAL TO ALLOW FOR THE COMPLETION OF DNA TESTING CONCERNING DARNELL RIDDLE.

V.  DEFENDANT IS ENTITLED TO BE RESENTENCED AS HIS SENTENCE OF TWENTY TO THIRTY YEARS FOR VOLUNTARY MANSLAUGHTER, AS A THIRD FELONY OFFENDER, WAS DISPROPORTIONATELY SEVERE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Coy*, 258 Mich. App. 1, 669 N.W.2d 831 (2003) (per curiam) ("*Coy II*"). Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Coy*, 469 Mich. 1029, 679 N.W.2d 65 (2004).

Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on August 13, 2004. As grounds for the writ of habeas corpus, he raises the five claims that he raised on his direct appeal. Respondent filed his answer on February 24, 2005. He contends that petitioner's second claim is barred by petitioner's procedural default, and that petitioner's remaining claims do not entitle petitioner to habeas relief.

## II.  LEGAL STANDARD

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

10

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the

Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

## III. DISCUSSION

A.   *DNA Statistical Evidence Claim (Claim I)*

Petitioner's first two habeas claims challenge the introduction of certain evidence at his trial. The Court concludes that petitioner is not entitled to habeas relief on these claims.

1.   *Clearly Established Law*

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness,

an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy."  *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings."  *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).  This general rule regarding the limited cognizability of evidentiary claims on federal habeas review applies equally to claims based on the allegedly improper admission of scientific evidence.  *See, e.g.*, *Norris v. Schotten*, 146 F.3d

13

314, 335 (6th Cir. 1998); *Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994); *Arnold v. Wyrick*, 646 F.2d 1225, 1228 (8th Cir. 1981); *Albanese v. McGinnis*, 823 F. Supp. 521, 553 (N.D. Ill. 1993).

2.     *The Davis/Frye Standard*

Before addressing the factual and legal issues surrounding petitioner's claim, it is appropriate to describe the standard pursuant to which the Michigan courts evaluate scientific evidence of the type at issue here.  At the time of petitioner's conviction, the Michigan courts applied the oft-used, and oft-criticized, framework established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).[1]

In *Frye*, the court established what came to be known as the "general acceptance" test for determining whether new or novel scientific techniques may be admitted into evidence.  The court explained:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define.  Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs*.

*Frye*, 293 F. at 1014 (emphasis added).  Although not explicitly "adopting" the *Frye* standard, the

---

[1]The test from *Frye* was the standard governing the admissibility of scientific evidence in the federal courts until it was abrogated by the adoption of Rule 702 of the Federal Rules of Evidence, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For an excellent discussion of the criticisms of the *Frye* test and the eventual abrogation of the *Frye* rule in the federal courts, see Major Victor Hansen, *Rule of Evidence 702: The Supreme Court Provides a Framework for Reliability Determinations*, 162 MIL. L. REV. 1, 3-18 (1999).

Effective January 1, 2004, Michigan amended Rule 702 to mirror the federal rule.  As the Michigan Supreme Court has explained, this amendment to Rule 702 explicitly incorporates the reliability standards identified by the United States Supreme Court in *Daubert*.  *See Gilbert v. DamilerChrysler Corp.*, 470 Mich. 749, 781, 685 N.W.2d 391, 408 (2004).  At the time of petitioner's trial and appeal, however, the *Davis/Frye* test was the means by which the admissibility of scientific evidence was determined in Michigan.  *See Coy II*, 258 Mich. App. at 10 n.3, 669 N.W.2d at 838 n.3; *People v. McMillan*, 213 Mich. App. 134, 137 n.2, 539 N.W.2d 553, 555 n.2 (1995).

14

Michigan Supreme Court employed a similar analysis in *People v. Davis*, 343 Mich. 348, 370-72, 72 N.W.2d 269, 281-82 (1955), and the Michigan courts have interpreted *Davis* as adopting the *Frye* rule. *See People v. Young*, 418 Mich. 1, 17-20, 340 N.W.2d 805, 812-13 (1983); *People v. Haywood*, 209 Mich. App. 217, 221, 530 N.W.2d 497, 499-500 (1995). Under the *Davis/Frye* rule, as it is known, novel scientific evidence is inadmissible unless the proponent of the evidence demonstrates that it has been generally accepted in the relevant scientific community. *See Haywood*, 209 Mich. App. at 221, 530 N.W.2d at 500.

      3.    *The State Court Proceedings*

           *a. The First Trial and Appeal*

At the first trial, the prosecution presented the testimony of Anita Matthews, a forensic serologist and the associate director of forensic identity testing at Laboratory Corporation of America ("Lab Corp."). With respect to the mixed samples found on the knife and doorknob,[2] Matthews testified that the DNA profile of the samples was consistent with the DNA having come from the victim and petitioner. *See Coy I*, 243 Mich. App. at 293, 620 N.W.2d at 894. However, while Matthews testified that it was possible to calculate a statistical estimate of the likelihood of finding the same DNA characteristics in another individual, she testified that "Lab Corp. performed no statistical interpretation of the results it achieved regarding the mixed DNA samples recovered from the knife blade and the doorknob because 'our laboratory policy is we do not calculate statistical estimates for mixed samples.'" *Id.* at 294, 620 N.W.2d at 894.

On appeal from petitioner's first conviction, the Michigan Court of Appeals concluded that

---

    [2]The prosecution also presented evidence at both trials regarding the DNA analysis of the semen found on the victim, and a statistical analysis of the match of that DNA to petitioner. Petitioner did not challenge this evidence in either direct appeal, nor does he do so here.

the admission of this DNA evidence, without any accompanying statistical interpretation, amounted

to plain error.  The court concluded that "Matthews' testimony regarding the consistency of

defendant's DNA with the mixed sample lifted from the knife blade and the doorknob is inadequate

by itself to meaningfully inform the jury concerning the likelihood of defendant's identity as the

DNA donor."  *Id.* at 295, 620 N.W.2d at 895.  Adopting the reasoning of the Delaware Supreme

Court, the court of appeals explained that statistical likelihood evidence beyond the simple evidence

of match is necessary

> "because, even though two human genomes may vary at approximately three million
> sites, the DNA typing analysis currently employed examines only a few sites for
> variation in the DNA sequence.  The theory is that, besides identical twins, no two
> individuals will have entire DNA sequences which are identical.  The DNA prints
> which result from the current FBI procedure may not be unique since the entire DNA
> molecule is not analyzed.  Since two unrelated individuals may have identical DNA
> patterns from the fragments examined in a particular analysis, the potential exists for
> a match to be mistakenly found.  For this reason, statistical interpretation regarding
> the probability of a coincidental match or the likelihood that two unrelated
> individuals have the same DNA type is necessary."

*Id.* (quoting *Nelson v. State*, 628 A.2d 69, 75-76 (Del. 1993)).  After examining the case law from

other jurisdictions, the Michigan Court of Appeals concluded that the DNA evidence would not

assist the trier of fact without some accompanying statistical analysis regarding the likelihood of a

match, and thus was inadmissible under Rule 702.  *See id.* at 301, 620 N.W.2d at 898.[3]  The court,

however, did "emphasize that we do not now declare or delineate the appropriate articulations for

expressing the extent or meaning of a potential match, but merely hold that some qualitative or

quantitative interpretation must accompany evidence of the potential match."  *Id.* at 302, 620

---

[3]The court of appeals also concluded that the DNA evidence was inadmissible under Rule 403
because, without accompanying statistical evidence, the probative value of the DNA match evidence
was substantially outweighed by the danger of unfair prejudice.  *See Coy I*, 243 Mich. App. at 302-03, 620
N.W.2d at 899.

N.W.2d at 899.  Concluding that the plain error affected the jury's verdict, the Michigan Court of Appeals reversed petitioner's conviction and remanded the case for a new trial.

### b.  The Second Trial and Appeal

Prior to retrial, the trial court held an extensive evidentiary hearing on the admissibility of the prosecution's statistical analyses of the mixed DNA samples found on the knife and doorknob. At the hearing, and at retrial, the prosecution's principal scientific witness was Megan Clement, a Technical Director at Lab Corp.  The Michigan Court of Appeals extensively described the testimony presented by the prosecution at the evidentiary hearing:

> The trial court recognized Clement as an expert, and she testified concerning Lab Corp's use of proficiency testing to ensure reliable DNA results.  It was determined that the sample taken from the knife blade had DNA from more than one contributor because multiple loci showed three characteristics.[1]  Neither defendant nor the victim could be excluded as contributors because characteristics of the mixed sample on the knife blade were contributed by either defendant or the victim. Thus, no evidence existed that anyone other than defendant and the victim contributed to the mixed sample.
>
> > [1]A person has only two characteristics at each locus or area of DNA, one contributed from the mother and one from the father.
>
> Testing of the mixed sample found on the victim's bedroom doorknob produced reportable results at five loci. The doorknob sample, like the knife blade sample, clearly contained a mixture of DNA from more than one person. The DNA profiles of the victim and defendant were compared against the profile from the doorknob. Neither the victim nor defendant could be excluded as contributors. Again, the characteristics in the doorknob sample were shared by the victim or defendant. Therefore, like the sample from the knife blade, the evidence pointed to only two contributors.
>
> Before the end of the year 2000, Lab Corp did not calculate statistical ratios for mixed sample DNA. In July 2000, the DNA Advisory Board endorsed two methods for calculating statistical ratios for mixed samples: the likelihood ratio and the probability of exclusion or probability of inclusion calculation. The FBI had developed a computer program using accepted statistical methods to replace handwritten probability calculations used with samples containing mixed DNA contributions.
>
> Clement testified that Lab Corp followed the recommendation of the DNA

Advisory Board and used the FBI computer program to calculate the probability of inclusion or exclusion statistical ratios regarding the mixed sample found on the knife blade. Clement testified that the combined probability of selecting an unrelated individual who could be included as a contributor to the mixture was 1 in 1,210 for the African-American population, 1 in 952 for the Caucasian population, 1 in 1,115 for the Southeastern Hispanic population, and 1 in 916 for the Southwestern Hispanic population. Clement further testified that the combined probability of exclusion was that 99.17 percent of the African-American population would be excluded as contributors to the mixture of DNA found on the knife blade. Hand calculations confirmed the accuracy of the computer calculations.

A likelihood ratio was also calculated for the mixed sample obtained from the knife blade. The sample from the knife blade was 164,000 times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown African-American person's DNA, 868,000 times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown Caucasian person's DNA, 1.03 million times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown Southeastern Hispanic person's DNA, and 944,000 times more likely to be a mixture of the victim's and defendant's DNA than to be a mixture of the victim's and an unknown Southwestern Hispanic person's DNA.

Clement also testified concerning the probability of inclusion or exclusion with respect to the doorknob sample. The probability of randomly selecting an unrelated individual who could be included as a contributor was 1 in 319 for the African-American population, 1 in 260 for the Caucasian population, 1 in 444 for the Southeastern Hispanic population, and 1 in 350 for the Southwestern Hispanic population. The combined probability of exclusion supported the conclusion that 99.68 percent of the African-American population would be excluded as potential contributors to the mixed DNA.

The likelihood ratio method was also used for statistical calculations regarding the mixed sample on the doorknob. Two alternative hypotheses were used. One was that the mixture derived from the victim and defendant, and the other was that it came from the victim and an unknown contributor. The sample from the doorknob was 3,100 times more likely to be a mixture of the victim's and defendant's DNA than a mixture of the victim's and an unknown African-American's DNA. It was 1,870 times more likely to be a mixture of the victim's and defendant's DNA than a mixture of the victim's and an unknown Caucasian person's DNA, and was 11,700 times more likely to be from the victim and the defendant than from the victim's and an unknown Southeastern Hispanic person, and was 6,720 times more likely to be a mixture of the victim's and defendant's DNA than a mixture of the victim's and an unknown Southwestern Hispanic person.

Clement testified very specifically that two databases are used to calculate statistics and explained each carefully. Clement also testified that the statistical calculations at issue are not novel or new and are used in many areas other than

18

forensics. While Clement agreed that the use of these statistical estimates was new to forensic laboratories, she explained that statisticians have used these statistical estimates for years to report statistics for mixture calculations. Because the forensic science community has endorsed them, laboratories now embrace statistical calculations for mixed contributor samples. The FBI's computer program has also been accepted by the scientific community and approved by statisticians and human geneticists. Clement testified that the two calculations used to calculate the statistics in this case are generally accepted in the scientific community in the field of statistics.

Dr. Frederick Bieber, a medical geneticist employed by the Harvard Medical School and the Brigham and Young Women's Hospital, also testified as an expert at the evidentiary hearing. Bieber explained likelihood ratios, their acceptance, reliability, and how they are used in many areas of science other than forensic DNA or forensic genetics. Bieber was on the DNA Advisory Board when it published its strong endorsement of the statistical calculations for mixed samples and which the director of the FBI approved for use in statistical estimation in forensic DNA work. The Michigan State Police has adopted one of the two calculations as an interim protocol for mixed DNA samples. Bieber believed that between twenty and thirty states were using the combined probability of exclusion/inclusion calculation for mixed DNA samples at the time of trial.

After Bieber testified, defendant waived his right to either present evidence or to obtain his own expert. After the parties presented their arguments to the court about the validity of the statistical evidence, the trial court denied defendant's motion to suppress, ruling that the prosecution's evidence at the hearing supported the admission of the statistics and was adequate to meet the *Davis-Frye* test and the requirements of this Court's prior opinion. The trial court concluded that the admissibility of DNA evidence and statistical evidence concerning DNA has been established throughout Michigan and the courts in this country.

*Coy II*, 258 Mich. App. at 5-9, 669 N.W. 2d at 836-38. At trial, Clement testified concerning the statistical analyses consistently with her testimony at the evidentiary hearing. *See* Trial Tr., dated 8/15/01 (Vol. I), at 13-48. She also testified that Christina McKee, Andre Settler, and Kareem Thrash were all excluded as possible contributors to the mixed DNA sample. *See id.* at 53, 58-63.

On appeal, petitioner argued that the statistical analyses employed by Clement had not gained general acceptance in the scientific community, and thus that the statistical evidence was inadmissible under the *Davis/Frye* test. The court of appeals rejected this argument. The court concluded that the statistical analyses used by Clement involved "no novel scientific techniques or

principles . . . such that a *Davis-Frye* analysis was necessary." *Coy II*, 258 Mich. App. at 10-11, 669 N.W.2d at 838. The court explained that the Michigan courts have accepted polymerase chain reaction (PCR) testing to obtain DNA profiles, and noted that its prior opinion was premised on the recognition that statistical evidence is integral to an analysis of DNA evidence. *See id*. at 11, 669 N.W.2d at 838-39. Examining other cases decided by the court of appeals, the court concluded that "[t]his Court has continued to reject *Davis-Frye* challenges to statistical analysis of DNA evidence, finding such arguments are relevant to the weight of the evidence, not its admissibility." *Id*. (discussing and citing *People v. Holtzer*, 255 Mich. App. 478, 491, 660 N.W.2d 405, 412 (2003); *People v. Leonard*, 224 Mich. App. 569, 591, 569 N.W.2d 663, 673 (1997); *People v. Chandler*, 211 Mich. App. 604, 611, 536 N.W.2d 799, 803 (1995)).

    4.    *Analysis*

Petitioner contends that he was denied a fair trial by the introduction of the statistical evidence regarding the match between the DNA from the mixed samples and petitioner's DNA. As noted above, the question is not whether the admission of this evidence was improper under the *Davis/Frye* rule, or whether the evidence was inadmissible on some other state law basis. Rather, the only issue for this Court on habeas review is whether the admission of the evidence denied defendant a fair trial; that is, whether the evidence was "almost totally unreliable" such that "the factfinder and the adversary system w[ould] not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). Petitioner has failed to meet this burden.

Petitioner does not contend that the underlying DNA profiling obtained by use of the PCR

method[4] was so unreliable as to deny him a fair trial, nor could he.  The courts have repeatedly held that the PCR method rests on a sufficiently reliable basis to be admitted under Federal Rule of Evidence 702 or state analogues.  *See, e.g.*, *United States v. Trala*, 386 F.3d 536, 541-42 (3d Cir. 2004); *United States v. Boswell*, 270 F.3d 1200, 1204-05 (8th Cir. 2001); *United States v. Shea*, 159 F.3d 37, 41 (1st Cir. 1998); *United States v. Gaines*, 979 F. Supp. 1429, 1433 n.4 (S.D. Fla. 1997) (citing decisions of over 20 state appellate courts).  Indeed, several courts, including the Michigan courts, have concluded that "the reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts . . . to take judicial notice of it[.]" *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996); *see also*, *Coy I*, 243 Mich. App. at 291-92, 620 N.W.2d at 893-94.

Petitioner does argue, however, that the statistical evidence supporting the underlying DNA profile evidence was not sufficiently reliable to be admitted at his trial.  This argument is without merit.  At the evidentiary hearing, Dr. Bieber testified that the statistical analyses were based on methods of statistical analysis that are well accepted in medical areas other than DNA forensic analysis, and which have been accepted as reliable in the scientific community.  *See* Evidentiary Hr'g Tr., dated 5/3/01, at 27-30.  Dr. Bieber and Clement both testified that the statistical conclusions were reached by application of the Federal Bureau of Investigation's POPS Stat program, which is a program that performs the mathematical calculations based on these underlying statistical techniques.  *See id.* at 45; Evidentiary Hr'g Tr., dated 3/2/01, at 37-38.

Petitioner has pointed to nothing to suggest that either the likelihood ratios or the inclusion/exclusion probabilities computed by Lab Corp. are, as a general matter, sufficiently

---

[4]For a description of the PCR method, see *United States v. Hicks*, 103 F.3d 837, 844-45 (9th Cir. 1996).

unreliable that their admission violated petitioner's right to a fair trial. These techniques were developed in accord with the National Research Council's 1996 *Evaluation of Forensic DNA Evidence* (usually cited in the case law and literature as *NRC II*). The courts have routinely found that statistical analyses performed pursuant to the standards set forth in *NRC II* are reliable and generally accepted, both as to probability statistics, *see Gaines*, 979 F. Supp. at 1434; *United States v. Shea*, 957 F. Supp. 331, 343 (D.N.H. 1997), *aff'd* 159 F.3d 37 (1st Cir. 1998); *People v. Reeves*, 91 Cal. Rptr. 2d 728, 747-48 (Cal. Ct. App. 2001), and likelihood rations, *see State v. Garcia*, 3 P.3d 999, 1003-04 (Ariz. Ct. App. 1999). More generally, the courts have recognized that "[s]tatistical probabilities are basic to DNA analysis and their use has been widely researched and discussed." *United States v. Davis*, 40 F.3d 1069, 1075 (10th Cir. 1994); *see also*, *United States v. Chischilly*, 30 F.3d 1144, 1153 (9th Cir. 1994); *United States v. Bonds*, 12 F.3d 540, 557, 565-66 (6th Cir. 1994); *Reid v. Page*, 47 F. Supp. 2d 1008, 1012-13 (C.D. Ill. 1999); *State v. Loftus*, 573 N.W.2d 167, 174-75 (S.D. 1997).

That leaves petitioner to argue that the application of the statistical techniques used in his case, although sufficiently reliable in the general sense, were insufficiently reliable as applied to the mixed DNA samples. Here, too, petitioner's claim fails. Both the testing and statistical techniques applied to mixed DNA samples are merely extensions of the generally accepted and generally reliable techniques applied to single source DNA samples. Thus, the testing and statistical techniques have consistently been upheld by the courts when applied to mixed DNA samples. *See, e.g.*, *Gaines*, 979 F. Supp. at 1439; *Garcia*, 3 P.3d at 1001, 1003-04; *People v. Smith*, 132 Cal. Rptr. 2d 230, 249-50 (Cal. Ct. App. 2003); *Wynn v. State*, 791 So. 2d 1258, 1259 (Fla. Ct. App. 2001); *Commonwealth v. McNickles*, 753 N.E.2d 131, 139 (Mass. 2001); *Commonwealth v. Rocha*, 784

22

N.E.2d 651, 657-58 (Mass. Ct. App. 2003); *State v. Ayers*, 68 P.3d 768, 776-77 (Mont. 2003). Indeed, "[l]ikelihood ratios are particularly useful . . . for trace evidence samples that contain DNA from more than one person."  David H. Kaye and George F. Sensabaugh, Jr., *Reference Guide on DNA Evidence*, in FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 534 & n.220 (2d ed. 2000) (citing *NRC II*, at 129).

To be sure, these methods of DNA testing and statistical analysis have not been universally embraced, and have been subject to extensive criticism.  *See, e.g.*, William C. Thompson, *Accepting Lower Standards: The National Research Council's Second Report on Forensic DNA Evidence*, 37 JURIMETRICS J. 405 (1997); Richard Lempert, *After the DNA Wars: Skirmishing with NRC II*, 37 JURIMETRICS J. 439 (1997); David J. Baldwin, *Errors & Misunderstandings in the Second NRC Report*, 37 JURIMETRICS J. 469 (1997).  Such scientific debate, however, does not itself require the exclusion of scientific evidence.  Even the most long-standing and well-established scientific principles are subject to debate and revision; Einstein's General Theory of Relativity upset three hundred years of understanding of Newtonian mechanics, and after a century of successfully describing the workings of the universe Einstein's theory continues to be hotly debated among scientists.  As the Supreme Court has explained, there are "no certainties in science."  *Daubert*, 509 U.S. at 590.

In short, scientific orthodoxy is required neither for admission of evidence under the Due Process Clause nor for its admission under Rule 702.  Here, the DNA evidence and the related statistical analyses were based on reliable and well accepted techniques, and the evidence was subject to extensive cross-examination by petitioner's counsel.  It was up to the jury to give the evidence the weight it considered due, and the evidence was not so "totally unreliable" that the jury

"w[ould] not be competent to uncover, recognize, and take due account of its shortcomings."

*Barefoot*, 463 U.S. at 899.  Thus, petitioner was not denied a fair trial by the admission of this

evidence, and therefore he is not entitled to habeas relief on this claim.

B.      *Hearsay Evidence Claim (Claim II)*

In his second claim, petitioner contends that he was denied a fair trial by the admission of

hearsay evidence.  At trial the prosecutor, over defense objection, elicited the following testimony

from Christina McKee:

> Q:      Ms. McKee, again, prior to your leaving the apartment that day to go to
> work, you had a conversation with Jenny Davidson pertaining to the
> Defendant.
> A:      Yes.
> Q:      What was it?
> A:      She had asked me to page Deane–I mean Laurence Coy–when I got to work
> because she had made plans with him earlier for him to come over after he
> got done babysitting, and asked me to page him just to remind him.

Trial Tr., dated 8/8/01 (Vol. II), at 98.  The Court concludes that petitioner is not entitled to habeas

relief on this claim.

1.      *Admission of the Evidence under Rule 803(3)*

The trial court admitted the evidence concerning Davidson's statement to Christina McKee

under the state of mind exception to the hearsay rule, which provides that a statement is not excluded

by the hearsay rule if it is "[a] statement of the declarant's then existing state of mind, emotion,

sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and

bodily health)[.]" MICH. R. EVID. 803(3).  The Michigan Court of Appeals rejected petitioner's claim

that this evidence was not properly admitted because the victim's state of mind was not at issue.

Noting that "the victim's statement of future intent or plan to meet with defendant on the night of

her murder falls within the plain meaning of the rule," *Coy II*, 258 Mich. App. at 14, 669 N.W.2d

at 840, the court explained that such statements are admissible if relevant to some issue in the case, even if the declarant's state of mind itself was not at issue. The court explained that the Michigan Supreme Court, in *People v. Fisher*, 449 Mich. 441, 537 N.W.2d 577 (1995), held admissible statements made by a murder victim even thought the victim's state of mind was not at issue, because the statements were relevant to issues involved in the case, particularly the defendant's motive and premeditation. *See Coy II*, 258 Mich. App. at 14, 669 N.W.2d at 840 (discussing *Fisher*, 449 Mich. at 447-50, 537 N.W.2d at 580-81). The court of appeals also noted that in *People v. King*, 215 Mich. App. 301, 544 N.W.2d 765 (1996), the court "specifically rejected the defendant's argument . . . that the victim's state of mind must be 'at issue' because [the Michigan] Supreme Court in *Fisher, supra*, did not take that approach." *Coy II*, 258 Mich. App. at 15-16, 669 N.W.2d at 841 (citing *King*, 215 Mich. App. at 309, 544 N.W.2d at 770).

Petitioner cannot show that he was denied a fair trial by the admission of this evidence, because the evidence was properly admitted under state law and was relevant to the issues involved in the trial. As the Michigan Court of Appeals explained, contrary to petitioner's argument relevant state of mind evidence is admissible under Rule 803(3) even if the declarant's state of mind itself is not at issue in the case. *See People v. Ortiz*, 249 Mich. App. 297, 307-10, 642 N.W.2d 417, 423-25 (2002); *People v. Riggs*, 223 Mich. App. 662, 704-05, 568 N.W.2d 101, 119 (1997); *King*, 215 Mich. App. at 309, 544 N.W.2d at 770. Further, contrary to petitioner's argument he was not denied a fair trial when the prosecutor used this evidence as substantive evidence of guilt. "Where one of the exceptions in the rules of evidence applies, hearsay is admissible as substantive evidence." *People v. Norris*, No. 248784, 2004 WL 2238593, at *4 (Mich. Ct. App. Oct. 5, 2004) (per curiam); *see also*, *People v. Poole*, 444 Mich. 151, 159, 506 N.W.2d 505, 509 (1993); *cf. Fireman's Fund Ins.*

25

*Co. v. Thien*, 8 F.3d 1307, 1311 n.10 (8th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2. *Confrontation Clause*

Petitioner also contends that the introduction of this hearsay evidence violated his Sixth Amendment right to confront the witnesses against him. Petitioner is not entitled to habeas relief on this claim.[5]

*a. Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). At the time of petitioner's trial and direct appeal, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980).[6] In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

---

[5]Respondent contends that this aspect of petitioner's claim is barred by petitioner's procedural default in the state courts. It is not clear, however, that the Michigan Court of Appeals actually applied a procedural bar to petitioner's claim. Although the court noted in passing that the claim was not preserved, the court then proceeded directly to a consideration of the merits, and did not further discuss the procedural bar. *See Coy II*, 258 Mich. App. at 16, 669 N.W.2d at 841 ("Because the trial court did not abuse its discretion by admitting the hearsay evidence at issue under Rule 803(3), defendant's unpreserved claim that his Confrontation Clause rights were violated is without merit."). It is questionable whether this is sufficient to establish a procedural bar to habeas review of this claim. *See Newell v. Hanks*, 283 F.3d 827, 835 (7th Cir. 2002) (citing cases). Because petitioner's confrontation claim is, in any event, without merit, the Court need not resolve the procedural default issue.

[6]Subsequent to petitioner's trial and direct appeal, the Supreme Court partially overruled *Roberts*. *See Crawford v. Washington*, 541 U.S. 36 (2004). The Court discusses the impact of *Crawford* on petitioner's claim in part III.B.2.c, *infra*.

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.

In order to be admissible, therefore, the hearsay testimony introduced at petitioner's trial must satisfy two criteria: (1) the declarant (Davidson) must have been unavailable at trial; and (2) the testimony must bear adequate indicia of reliability. As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of the constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

### b. Analysis

Here, the Michigan Court of Appeals explicitly applied the *Roberts* rule, and concluded that the admission of Davidson's hearsay statement to Christina McKee did not violate the Confrontation Clause because it was admitted pursuant to a firmly rooted hearsay exception. *See Coy II*, 258 Mich. App. at 16, 669 N.W.2d at 841. This was a reasonable application of *Roberts*.

As to the first prong of the *Roberts* test, it is clear that Davidson was unavailable. *See Moore*

*v. Reynolds*, 153 F.3d 1086, 1107 (10th Cir. 1998).  However the second prong–reliability–presents

a much more difficult question.  As noted above, reliability can be inferred, without more, if the

statement is admitted pursuant to a "firmly rooted" hearsay exception.  *See Roberts*, 448 U.S. at 66.

More recently, the Supreme Court has explained that a hearsay exception is firmly rooted

> if, in light of longstanding judicial and legislative experience, it rests on such a solid
> foundation that admission of virtually any evidence within it comports with the
> substance of the constitutional protection.  This standard is designed to allow the
> introduction of statements falling within a category of hearsay whose conditions have
> proved over time to remove all temptation to falsehood, and to enforce as strict an
> adherence to the truth as would the obligation of an oath and cross-examination at
> trial.

*Lilly v. Virginia*, 527 U.S. 116, 126 (1999) (internal quotations, citations, and alterations omitted).

Under this standard, it is well-established that the state of mind exception to the hearsay rule is, as

a general matter, a firmly established exception for Confrontation Clause purposes.  *See Horton v.*

*Allen*, 370 F.3d 75, 84 (1st Cir. 2004); *Yucel v. Berghuis*, 86 Fed. Appx. 918, 919 (6th Cir. 2004);

*Terronova v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988); *United States v. Johnson*, 354 F. Supp.

2d 939, 964 (N.D. Iowa 2005); *Frazier v. Mitchell*, 188 F. Supp. 798, 812-13 (N.D. Ohio 2001),

*rev'd in part on other grounds sub nom. Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003).

Here, however, the Court is faced not with state-of-mind evidence in general, but with that

subset of state-of-mind evidence admissible under the so-called *Hillmon* doctrine: that is, state-of-

mind evidence used to prove future conduct.  Indeed, the evidence at issue here comes within a

further subset of the *Hillmon* doctrine itself: state-of-mind evidence used to prove the future conduct

not of the declarant, but of a third party.  Although the state-of-mind exception is firmly rooted as

a general matter, it is much less clear whether the *Hillmon* doctrine component of the state-of-mind

28

exception is firmly rooted.[7]

The *Hillmon* doctrine derives from the Supreme Court's decision in *Mutual Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285 (1892), a case which represents "'the starting point for all discussions regarding statements of intention to prove a subsequent act.'" Glen Weissenberger, *Hearsay Puzzles: An Essay on Federal Evidence Rule 803(3)*, 64 TEMP. L. REV. 145, 156 (1991) (quoting 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(3)[04], at 803-116 (1988)) [hereinafter "Weissenberger"].   In *Hillmon*, the plaintiff Sallie E. Hillmon brought actions against various insurance companies to recover on life insurance policies on her husband, John W. Hillmon.  Mrs. Hillmon alleged that John Hillmon died on March 17, 1879, in Kansas at a place called Crooked Creek.   In answer, the insurance companies contended that the Hillmons, together with other persons, had falsely represented that John Hillmon was dead and that the body procured to prove his death was in reality that of Frederick Walters, who was also missing at the time.  *See Hillmon*, 145 U.S. at 285-87.  The body had been taken to a neighboring town and, after an inquest, buried. "Upon the question whose body this was there was much conflicting evidence, including

---

[7]It is itself questionable whether this distinction should matter for Confrontation Clause purposes.  In dissent, Justice Marshall observed that *Roberts* does not "mean that any hearsay evidence which can be squeezed under the rubric of a state hearsay exception has met the reliability standard required by the Sixth Amendment."  *Boliek v. Missouri*, 479 U.S. 903, 903 (Marshall, J., dissenting from denial of certiorari).  Thus, "[w]hen evidence nominally received under a particular hearsay exception is presented for purposes other than those the exception was designed to serve, the constitutional analysis should not end with the mere semantic invocation of the rule."  *Id.*; *see also*, *Hayes v. York*, 311 F.3d 321, 325 (4th Cir. 2002) ("Whether North Carolina's state-of-mind hearsay exception encompasses declarations that do not fit within the firmly-rooted state-of-mind hearsay exception recognized by Supreme Court precedent can only be answered by looking to what the Supreme Court has said about the basis and character of the firmly-rooted state-of-mind exception.").  On the other hand, the Court has at least implicitly suggested that even where certain aspects of a hearsay exception are liberalized, the exception does not lose its status as a firmly rooted exception.  *See Bourjaily v. United States*, 483 U.S. 171, 184 n.4 (1987).  Because it does not alter the ultimate conclusion in this case, the Court assumes that the discrete category of *Hillmon*-type state-of-mind statements must itself constitute a firmly rooted exception to satisfy *Roberts*.

photographs and descriptions of the corpse, and of the marks and scars upon it, and testimony to its likeness to Hillmon and Walters." *Id*. at 287. To buttress their case, the insurance companies sought to introduce letters from Walters to his sister and fiancee, in which Walters stated his intention to accompany Hillmon in search of a cattle ranch. *See id*. at 287-89. The trial court sustained plaintiff's objections to these letters. *See id*.

Considering the admissibility of these letters, the Court concluded that the trial court had erred in excluding the letters as impermissible hearsay. The Court explained that "[a] man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written." *Id*. at 295. Thus, when otherwise relevant, a statement of future intention "may be proved by contemporaneous oral or written declarations of the party." *Id*. In adopting this rule, the Court relied on what would today be recognized as the general state-of-mind exception: "'Whenever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence.'" *Id*. at 296 (quoting *Insurance Co. v. Mosley*, 75 U.S. (8 Wall.) 397, 404 (1869)). Addressing the historical basis of the hearsay rule, the Court further reasoned:

> The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be. After his death there can hardly be any other way of proving it, and while he is still alive his own memory of his state of mind at a former time is no more likely to be clear and true than a bystander's recollection of what he then said, and is less trustworthy than letters written by him at the very time and under circumstances precluding a suspicion of misrepresentation.

*Id*. The Court concluded therefore, in a passage that represents the heart of the *Hillmon* doctrine, that the letters were competent evidence to show that shortly before Walters went away from Wichita to parts unknown, "he had the intention of going, and of going with Hillmon, which made

30

it more probable both that he did go and that he went with Hillmon than if there had been no proof

of such intention." *Id*. at 296.  Put succinctly, then, "[u]nder the *Hillmon* doctrine, statements are

admissible not only to prove the future conduct of the declarant but also the future conduct of other

persons when the declarant's intention requires the action of these other persons if it is to be

fulfilled." *Brown v. Tard*, 552 F. Supp. 1341, 1352 (D.N.J. 1982).

In the relatively immediate aftermath of the decision, the *Hillmon* doctrine was generally

praised, or at the least accepted as not significantly noteworthy.  *See* John M. Maguire, *The Hillmon*

*Case–Thirty-Three Years After*, 38 HARV. L. REV. 709, 710 & nn.4-7 (1925).  Since those early

days, however, the *Hillmon* doctrine has been the subject of substantial criticism.  As early as 1933,

the Supreme Court recognized that the *Hillmon* doctrine "has developed a substantial body of

criticism and commentary" and represents the "high-water line beyond which courts have been

unwilling to go."  *Shepard v. United States*, 290 U.S. 96, 105 (1933).[8]  That body of criticism has

extended to more recent times.  *See, e.g.*, Douglas D. MacFarland, *Dead Men Tell Tales: Thirty*

*Times Three Years of the Judicial Process After Hillmon*, 30 VILL. L. REV. 1 (1985); Thomas A.

Wiseman, III, Note, *Federal Rule of Evidence 803(3) and the Criminal Defendant: The Limits of the*

*Hillmon Doctrine*, 35 VAND. L. REV. 659 (1982).  Notwithstanding these criticisms, the *Hillmon*

doctrine has not suffered from want of scholarly and judicial support.  *See* Weissenberger, *supra*,

at 159 ("In sum, statements of intent are admissible as a class of hearsay because these statements

possess circumstantial guarantees of trustworthiness that attend all internally referent statements.");

Maguire, *supra*, at 731 (recognizing possibility of dangerous extensions of the *Hillmon* doctrine but

---

[8]Importantly, however, neither in *Shepard* nor any subsequent case has the Court called into
question the continued validity of the *Hillmon* doctrine, a point important for purposes of the *Roberts*
inquiry.

concluding "that in its ordinary, workaday application the principle leads to more good than evil.").

In 1975, Congress codified the Federal Rules of Evidence, gathering together the disparate common law evidentiary rules that had been developed by the federal courts. This codification included Rule 803(3), which as explained above removes from the ambit of the exclusionary hearsay rule "a statement of the declarant's then existing state of mind[.]" FED. R. EVID. 803(3).[9] Rule 803(3) itself does not directly address the *Hillmon* doctrine, but the Advisory Committee note states that by the adoption of Rule 803(3) "[t]he rule of . . . *Hillmon* . . ., allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed." FED. R. EVID. 803(3), 1972 advisory committee note. Notwithstanding this statement in the Advisory Committee note, however, the report of the House Judiciary Committee states that it intended Rule 803(3) to "be construed to limit the doctrine of . . . *Hillmon*, so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person." H.R. REP. NO. 93-650, at 13-14 (1973), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7075, 7087.

The split of scholarly and judicial opinion on the *Hillmon* doctrine prior to the adoption of the Federal Rules, coupled with the less than clear legislative history underlying Rule 803(3), have lead to divergent interpretations of Rule 803(3). The seminal modern decision involving the intersection between the *Hillmon* doctrine and Rule 803(3) is *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976). In that case, the court considered a criminal trial which had occurred prior to

---

[9]The discussion which follows focuses on Federal Rule of Evidence 803(3). This discussion is relevant for two reasons. First, it bears on the question of whether the *Hillmon* doctrine is a firmly rooted hearsay exception. Second, Michigan Rule of Evidence 803(3) is identical to the federal rule, *see* MICH. R. EVID. 803(3), 1978 Note, and the Michigan courts thus look to the advisory committee notes and case law developed under the rule in applying Michigan Rule 803(3). *See People v. Moorer*, 262 Mich. App. 64, 73, 683 N.W.2d 736, 742 (2004); *People v. Furman*, 158 Mich. App. 302, 316, 404 N.W.2d 246, 253 (1987) (explicitly adopting *Hillmon* rule).

the adoption of the Federal Rules, and thus the court did not directly decide the scope of Rule 803(3). In *Pheaster*, similar to petitioner's case, the prosecution presented two witnesses who testified that the victim told them that he was going to meet the defendant later in the evening on the day that he disappeared, in order to show both the victim's and the defendant's conduct on that evening. Although recognizing that the *Hillmon* doctrine is "extraordinary" and has "create[d] controversy and confusion," *Pheaster*, 544 F.2d at 376, the Ninth Circuit nonetheless concluded that "[d]espite the theoretical awkwardness associated with the application of the *Hillmon* doctrine to facts such as those now before us, the authority in favor of such an application is impressive, beginning with the seminal *Hillmon* decision itself." *Id.* at 377.

Although the Ninth Circuit based its decision on the applicable common law state-of-mind exception, as explicated in *Hillmon*, the Court also looked to Rule 803(3) "for any light that [it] may shed on the status of the common law at the time of the trial." *Pheaster*, 544 F.2d at 379. The court noted, but did not definitively resolve, the conflict between the Advisory Committee note and the House Report, concluding only that even the House Report suggested that the common law prior to the adoption of the Federal Rules provided that the *Hillmon* doctrine was applicable to the facts before the Court. *See id.* Nevertheless, the Ninth Circuit has subsequently relied on *Pheaster* in upholding introduction of *Hillmon* declarations to show the future conduct of a nondeclarant under Rule 803(3). *See United States v. Astorga-Torres*, 682 F.2d 1331, 1335-36 (9th Cir. 1982); *cf. Terrovona v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1988).

Only two other federal courts of appeals have considered the issue. Contrary to the broad view adopted by the Ninth Circuit, the Fourth Circuit has taken a much more restrictive view. In *United States v. Jenkins*, 579 F.2d 840 (4th Cir. 1978), the court relied on the House Committee

33

Report to conclude that the portion of *Hillmon* dealing with statements introduced to show the future conduct of a nondeclarant did not survive the adoption of Rule 803(3).  *See Jenkins*, 579 F.2d at 843. Nevertheless, the Court also held that if a *Hillmon* type statement were admissible for some other valid reason–*e.g.*, to show why the declarant acted as she did–the jury would be permitted to draw any inference it wished from the hearsay statement.  *See id.* at 844.  Thus, even the Fourth Circuit's restrictive rule allows to be introduced some, and perhaps in practice a substantial amount of, *Hillmon* statements from which the jury can infer a nondeclarant's future conduct.  The Second Circuit has adopted a middle approach.  Under this approach, the court follows the Ninth Circuit in allowing admission of *Hillmon* statements to establish a nondeclarant's future conduct.  However, unlike the Ninth Circuit, the Second Circuit allows such evidence under Rule 803(3) only where there is independent evidence connecting the declarant's statement with the nondeclarant's subsequent conduct.  *See United States v. Best*, 219 F.3d 192, 198-99 (2d Cir. 2000).

Unlike the federal courts, the states have been much more uniform in adopting the whole of the *Hillmon* doctrine, including its application to a nondeclarant's future conduct.  Whether addressing the issue under the common law or state analogues to Rule 803(3), and whether doing so explicitly or implicitly, the "overwhelming majority of jurisdictions," *People v. Chambers*, 512 N.Y.S.2d 89, 91 (N.Y. App. Div. 1984)–at least 28–have allowed introduction of *Hillmon* statements to establish the future conduct of a nondeclarant under the state of mind exception.[10]  Only three

---

[10]*See Zumbado v. State*, 615 So. 2d 1223, 1236-37 (Ala. Crim. App. 1993); *State v. McDonald*, 872 P.2d 627, 642-43 (Alaska 1994); *State v. Adamson*, 665 P.2d 972, 979 (Ariz. 1983); *State v. Abernathy*, 577 S.W.2d 591, 593 (Ark. 1979); *People v. Majors*, 956 P.2d 1137, 1150 (Cal. 1998); *People v. Madson*, 638 P.2d 18, 29 & n.15 (Colo. 1981); *State v. Santangelo*, 534 A.2d 1175, 1184 (Conn. 1987); *Reyes v. State*, 819 A.2d 305, 313-14 (Del. 2003); *People v. Jones*, 406 N.E.2d 112, 114 (Ill. Ct. App. 1980); *State v. Cugliata*, 372 A.2d 1019, 1029 (Me. 1977), *overruled on other grounds, State v. Brewer*, 505 A.2d 774 (Me. 1985); *People v. Furman*, 158 Mich. App. 302, 316, 404 N.W.2d 246, 253 (1987); *State v. Richards*, 552 N.W.2d 197, 209 (Minn. 1996); *Bogan v. State*, 754 So. 2d 1289, 1293 (Miss. Ct. App. 2000); *State v. Sharbono*, 563 P.2d 61,

jurisdictions have reached the opposite conclusion that such statements are not admissible under the

state of mind exception.  *See Brooks v. State*, 787 So. 2d 765, 770-71 (Fla. 2001); *Clark v. United*

*States*, 412 A.2d 21, 29-30 (D.C. 1980); LA. CODE EVID. ANN. art. 803(3) (West 1995).[11]

No court appears to have explicitly addressed whether *Hillmon* statements, and in particular

such statements used to show a nondeclarant's future conduct, fall within a firmly rooted hearsay

exception.[12]  Nevertheless, in light of the development of the *Hillmon* doctrine it would appear that

the admission of state-of-mind declarations to show the future conduct of a nondeclarant, such as

the statements at issue here, is in conformity with a firmly rooted hearsay exception.  The rule has

lasted for over a century, and in some form or another is applied in nearly all of the jurisdictions that

68 (Mont. 1977); *Lisle v. State*, 941 P.2d 459, 467 (Nev. 1997); *State v. Benedetto*, 576 A.2d 828, 832 (N.J. 1990); *People v. James*, 717 N.E.2d 1052, 1058-59 (N.Y. 1999); *State v. McElrath*, 366 S.E.2d 442, 452 (N.C. 1988); *State v. Brewer*, 549 N.E.2d 491, 502 (Ohio 1990); *Commonwealth v. Collins*, 703 A.2d 418, 425 (Pa. 1997); *State v. Griffin*, 528 S.E.2d 668, 669-70 (S.C. 2000); *Johnson v. Skelly Oil Co.*, 288 N.W.2d 493, 494 (S.D. 1980); *State v. Hutchinson*, 898 S.W.2d 161, 172 (Tenn. 1994); *Nguyen v. State*, No. 14-97-01324-CR, 2000 WL 674894, at *1 (Tex. Ct. App. May 25, 2000) (citing *Norton v. State*, 771 S.W.2d 160, 165-66 (Tex. Ct. App. 1989)); *State v. Mortensen*, 73 P. 562, 568-70 (Utah 1903); *Hodges v. Commonwealth*, ___ S.E.2d ___, ___, 2005 WL 1330388, at *9-*10 (Va. Ct. App. June 7, 2005); *State v. Terrovona*, 716 P.2d 295, 298-300 (Wash. 1986); *Young v. State*, 849 P.2d 754, 767 (Wyo. 1993).

[11]It is unclear whether a fourth state, Oregon, has also adopted this position.  In *State v. Clegg*, 984 P.2d 332 (Or. Ct. App. 1999), *rev'd*, 31 P.3d 408 (2001), the Oregon Court of Appeals relied on the explicit legislative commentary accompanying Oregon's version of Rule 803(3) to conclude that "statements of intent by a declarant [are] admissible only to prove the declarant's future conduct, not the future conduct of another person."  *Clegg*, 984 P.2d at 336.  On appeal, the Oregon Supreme Court reversed, concluding that the court of appeals had erroneously determined that the hearsay in that case was used to establish the defendant's future conduct; rather, the evidence was used solely to establish the defendant's motive, and not future conduct.  *See Clegg*, 31 P.3d at 414 n.8.  Although the Oregon Supreme Court did not question the court of appeals's statement of the rule (as opposed to its application in the particular case), the court did also note that "defendant has not even attempted to show why, if the evidence otherwise were admissible, the prosecution was not entitled to rely on the various inferences that were available from the evidence."  *Id*.  This statement suggests a rule similar to the rule adopted by the Fourth Circuit in *Jenkins*.

[12]Some courts have held that such statements fall within the firmly rooted exception for statements reflecting state of mind.  These courts, however, have not engaged in any analysis of the *Hillmon* problem in particular.  *See, e.g.*, *Terrovona*, 852 F.2d at 427; *McDonald*, 872 P.2d at 642-43.

have considered the issue.  Rule 803(3) appears on its face to codify the *Hillmon* doctrine in its entirety, and the note of the Advisory Committee to Federal Rule 803(3) confirms this interpretation of the text.  In light of the exception's long-standing and widespread use, the state-of-mind exception appears to be firmly rooted even as to statements tending to show the future conduct of a nondeclarant.  *See White v. Illinois*, 502 U.S. 346, 355 n.8 (1992) (holding that the excited utterance exception is firmly rooted because it is at least two centuries old, codified in the federal rules, and recognized in nearly four-fifths of the states, and that the medical treatment exception is firmly rooted because it is similarly recognized in the federal rules and widely accepted among the states).[13]

More fundamentally, the issue here is not whether the admission of *Hillmon* statements to show a nondeclarant's future conduct is in fact within a firmly rooted hearsay exception.  In this habeas action, the only question is whether the Michigan Court of Appeals reasonably so concluded in light of clearly established Supreme Court precedent.  Whatever else may be said, our review of state and federal *Hillmon* jurisprudence certainly establishes that the Michigan Court of Appeals' decision is not clearly contrary to, nor an unreasonable application of, clearly established federal as determined by the Supreme Court.  And, while resolution of the current standing of the *Hillmon*

---

[13]The House Committee Report addressing *Hillmon* under Federal Rule 803(3) is insufficient to question this conclusion.  Even as a matter of statutory interpretation, the plain language of Rule 803(3) would not by trumped by this single committee report "which, as far as we know, not even the full committee, much less the full [House], much much less the full [Senate], and much much much less the President who signed the bill, agreed with."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, ___, 124 S. Ct. 2466, 2484 (2004) (Scalia, J., concurring in the judgment); *see also*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. ___, ___, ___ S. Ct. ___, ___, slip op. at 21 (June 23, 2005) ("[J]udicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members–or, worse yet, unelected staffers and lobbyists–both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.").  Much less can the Report bear the burden of uprooting the firmly established *Hillmon* doctrine, particularly in light of its continued, widespread application following the enactment of Rule 803(3).

doctrine is certainly not without room for debate, a federal habeas case reviewing a state court's treatment of the doctrine is not the appropriate vehicle to declare it settled law retroactively for the first time.

A number of factors support this conclusion. First, "[t]he Supreme Court has simply never held, nor even suggested, that state-of-mind declarations that [are used to show a nondeclarant's future conduct] do not fit within the firmly-rooted state-of-mind exception[.]" *Hayes v. York*, 311 F.3d 321, 325 (4th Cir. 2002). On the contrary, the Supreme Court itself established the *Hillmon* doctrine, and the Court has not since questioned that doctrine with respect to state-of-mind declarations of intent to show either a declarant's or a nondeclarant's future conduct. In addition, Michigan's "interpretation of its state-of-mind exception . . . is shared by a number of other jurisdictions." *Id*. at 326.

In light of the widespread and long-standing application of the *Hillmon* doctrine, "[p]etitioner has failed to show that the state court's holding that the hearsay statements fell within a firmly rooted exception to the hearsay rule was an unreasonable application of Supreme Court precedent." *Williams v. White*, 183 F. Supp. 2d 969, 977 (E.D. Mich. 2002) (Hood, J.).[14] Accordingly, the Court

---

[14]Despite the foregoing discussion, it is questionable whether this issue actually raises a hearsay, and hence a Confrontation Clause, problem. As explained at the start of the Court's *Hillmon* discussion, there is no dispute that the state-of-mind exception in general is firmly rooted, nor is there a dispute that the *Hillmon* doctrine is within this firmly rooted exception to the extent that a statement of intent is used to show the declarant's own future conduct. Such statements are admissible because they are, in general experience, accurate and reliable and made under circumstances where fabrication is unlikely. In terms of the hearsay rules, however, there is no distinction between using the statement "I am going out with Frank tonight" to show the declarant's conduct or Frank's conduct. The statement bears the same indicia of reliability, accuracy, and truthfulness regardless of the *purpose* for which the statement is introduced. Rather, using the statement to show the nondeclarant's future conduct raises concerns addressed by the relevancy rules, rather than the hearsay rules. As Professor Weissenberger explains:

That rule 803(3) and its historical antecedents operate only to admit contemporaneous statements of internal mental condition is frequently misunderstood. Whether these statements may be received as proof of subsequent events is a matter of relevancy and

37

concludes that petitioner is not entitled to habeas relief on this claim.

### c. Impact of Crawford v. Washington

As noted above, in *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id.* at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

The Supreme Court's decision in *Crawford* does not affect the resolution of petitioner's

---

circumstantial proof. Admittedly, the probative force of statements offered to show subsequent conduct is weakened by acknowledging that interceding events may diminish the possibility of subsequent conduct. Analysis of the use of a declaration of intent, however, pertains to the inferences drawn from the statement, not the qualification of the statements as one that the hearsay system ought to admit.

Weissenberger, *supra*, at 158-59 (footnote omitted); *see also*, 6 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1725, at 139 (Chadbourn rev. ed. 1976) ("It is obvious, yet it needs to be emphasized, that the nature of the act to be evidenced by the design has nothing whatever to do with the admissibility of declarations of design. The latter are absolutely admissible as statements of a mental condition, under the present exception, to prove the design; what the design evidences, or whether it is relevant at all, does not affect the broad scope of this exception."); GLEN WEISSENBERGER & JAMES J. DUANE, FEDERAL EVIDENCE § 803.15, at 471 (4th ed. 2001). Because it does not affect the Court's ultimate conclusion, the Court need not explore this interesting question further.

Confrontation Clause claim, however, for two reasons.  First, *Crawford* was not the rule of law applicable at the time of petitioner's trial and direct appeal; *Roberts* was.  Under § 2254(d)(1), habeas relief is available only if the state court's decision was contrary to, or an unreasonable application of, "clearly established federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  As the Supreme Court has explained, "clearly established law" under § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*."  *Lockyer*, 538 U.S. at 72 (emphasis added).  Because petitioner's trial and direct appeal pre-date the Supreme Court's decision, *Crawford* does not constitute "clearly established law" upon which habeas relief for petitioner may be predicated.  *See Brown v. Uphoff*, 381 F.3d 1219, 1224 n.4 (10th Cir. 2004); *Lies v. Jackson*, 100 Fed. Appx. 378, 379 (6th Cir. 2004). *But see Bockting v. Bayer*, 399 F.3d 1010, 1021 (9th Cir. 2005).

Second, even assuming that *Crawford* could be relied upon as clearly established law, the decision in *Crawford* does not alter the result here.  As explained above, *Crawford* abrogated *Roberts* only with respect to "testimonial" hearsay statements.  The Court explicitly left untouched the application of *Roberts* to cases involving nontestimonial hearsay: "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether."  *Crawford*, 541 U.S. at 68.  As the courts applying *Crawford* have observed,

> [t]he lynchpin of the *Crawford* decision thus is its distinction  between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements. . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d

75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005);

*United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004).

In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive

definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some

guidance. Specifically, the Court provided three possible "formulations of th[e] core class of

'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as
> affidavits, custodial examinations, prior testimony that the defendant was unable to
> cross-examine, or similar pretrial statements that declarants would reasonably expect
> to be used prosecutorially; [2] extrajudicial statements contained in formalized
> testimonial materials, such as affidavits, depositions, prior testimony, or confessions;
> [and] [3] statements that were made under circumstances which would lead an
> objective witness reasonably to believe that the statement would be available for use
> at a later trial.

*Id.* at 51-52 (internal quotations and citations omitted); *see also*, *Hendricks*, 395 F.3d at 179-80;

*Horton*, 370 F.3d at 84. While the Court declined to adopt any of these three formulations, the Court

noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior

testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police

interrogations." *Crawford*, 541 U.S. at 68.

Although *Crawford* did not provide a precise dividing line between "testimonial" and

"nontestimonial" statements, there can be no doubt that Davidson's statement introduced at

petitioner's trial falls on the nontestimonial side of the line. The language of the *Horton* decision,

which found *Crawford* inapplicable to the introduction of evidence under the state of mind exception

to the hearsay rule, is directly applicable here:

> In light of these formulations, [Davidson's] statement[] do[es] not qualify as
> testimonial. [It was] not ex-parte in-court testimony or its equivalent; [was] not
> contained in formalized documents such as affidavits, depositions, or prior testimony

40

> transcripts, and [was] not made as part of a confession resulting from custodial examination. Rather, [Davidson's] statement[] [was] made during a private conversation with [McKee]. In short, [Davidson] did not make the statement[] under circumstances in which an objective person would "reasonably believe that the statement would be available for use at a later trial." Because [Davidson's] statement[] [was] not testimonial, [its] admission is outside of *Crawford*'s scope.

*Horton*, 370 F.3d at 84 (internal citation omitted); *see also*, *Savoca*, 335 F. Supp. 2d at 392. Accordingly, *Crawford* provides no basis for habeas relief. Because the court of appeals's application of *Roberts* was neither contrary to, nor an unreasonable application of, clearly established federal law, petitioner is not entitled to habeas relief on this claim.

C.      *Right to Present Defense Claims (Claims III & IV)*

Petitioner contends that he was denied a fair trial and the right to present a defense when the trial court: (1) refused to adjourn the trial so that he could locate a witness to impeach the testimony of Jordan McKee or, alternatively, to strike Jordan's testimony; and (2) adjourn the trial to allow for the completion of DNA testing on Darnell Riddle. The Court concludes that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the

41

right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Although the Supreme Court has not more specifically set forth governing standards to determine when a failure to grant a continuance will constitute a denial of the right to present a meaningful defense, the Court has noted that the grant or denial of a motion for a continuance is within the sound discretion of the trial judge, and will be reviewed only for an abuse of that discretion.  *See Avery v. Alabama*, 308 U.S. 444, 446 (1940).  The Court has also explained that "[i]t would take an extreme case to make the action of the trial court in such a case a denial of due process of law." *Franklin v. South Carolina*, 218 U.S. 161, 168 (1910).  Thus, as the Sixth Circuit has explained:

> A trial court's failure to grant a continuance to enable a defendant to exercise his constitutionally protected right to offer the testimony of witnesses and to compel their attendance may, in some circumstances, constitute a denial of due process. When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process.  To warrant habeas relief, there must also be some showing that granting the continuance would have furthered the court's attempt to secure a just determination

> of the cause.  We have considered the following factors in determining whether an
> accused was deprived of his right to due process by a denial of a motion for a
> continuance: the diligence of the defense in interviewing witnesses and procuring
> their presence, the probability of procuring their testimony within a reasonable time,
> the specificity with which the defense is able to describe their expected knowledge
> or testimony, the degree to which such testimony is expected to be favorable to the
> accused, and the unique or cumulative nature of the testimony.

*Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000) (internal citations, quotations, and footnotes

omitted); *see also*, *Scott v. Roberts*, 975 F.2d 1473, 1475 (10th Cir. 1992).  Importantly, denial of

a continuance amounts to a due process violation warranting habeas relief only where the petitioner

shows that he was prejudiced by the omission of the evidence he would have procured had the

continuance been granted.  *See Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000); *cf. United*

*States v. Allen*, 247 U.S. 741, 771 (8th Cir. 2001) (applying same standard in case on direct review);

*United States v. Hall*, 200 F.3d 962, 964 (6th Cir. 2000) (same).

### 2.      *Jordan McKee Testimony (Claim III)*

At trial, Jordan McKee testified that he heard and saw a man come to the apartment the night

of the murder, and heard Ms. Davidson screaming.  Jordan identified the man as petitioner, primarily

due to the black coat with a circle on the back the man was wearing, which he said was the same

jacket petitioner had been wearing during a visit to the apartment earlier that day.  *See* Trial Tr.,

dated 8/9/01 (Vol. II), at 33-36.  Prior to the selection of the jury, petitioner moved for an

adjournment so that he could locate Pam Perry to testify as an impeachment witness.  According to

defense counsel, Perry could testify that she overheard Jordan, on the night of the murder, tell family

members that his "daddy" could have committed the offense.  *See* Trial Tr., dated 8/7/01, at 3-6, 16-

17.  The trial court took the matter under advisement, instructing the prosecutor to assist the defense

in locating Perry.  After receiving several status reports on the attempts to locate Perry, the court

denied petitioner's motions for an adjournment, to strike Jordan's testimony, and for a mistrial.  *See id*. at  21-25, 45-46; Trial Tr., dated 8/8/01 (Vol. II), at 3-4; Trial Tr., dated 8/9/01 (Vol. II), at 25-26; Trial Tr., dated 8/22/01, at 3-13.   The Michigan Court of Appeals rejected petitioner's claim, reasoning:

> The trial court did not abuse its discretion when it denied defendant's motion to adjourn. Defendant did not use due diligence to locate Perry. On July 13, 2001, the prosecutor gave notice that he intended to call Jordan as a witness at the retrial. On August 7, 2001, the day scheduled for trial, defendant moved for an adjournment. There was no evidence that he made any effort, much less a diligent one, to locate Perry before requesting the adjournment. MCR 2.503(C). The record indicates that in the weeks leading up to trial, Perry's address was produced within minutes of the defense's request that the prosecutor check Perry's name on the Law Enforcement Information Network (LEIN) system. Perry was evicted on the very day that defendant requested his adjournment. Had defendant exerted even minimal efforts to locate Perry before trial, he may have found her. Moreover, defendant cannot demonstrate prejudice. Even if Perry had been located, no foundation existed for admitting her impeachment testimony. Defendant failed to confront Jordan with his alleged prior statement to Perry. MRE 613(b). Further, there is nothing in the record to confirm that Perry would have testified in accord with defendant's investigator's report.

*Coy II*, 258 Mich. App. at 19, 669 N.W.2d at 842-43.  This determination was reasonable.

As the Michigan Court of Appeals noted, petitioner failed to exercise due diligence in locating Perry.  Although Perry's address was readily available, and would have provided a means to locate her prior to her eviction on the date that petitioner requested an adjournment, counsel failed to make any attempt prior to trial to locate Perry and secure her attendance.  Thus, it was petitioner's lack of diligence which primarily accounted for the absence of Perry's testimony.  *See United States v. King*, 762 F.2d 232, 235 (2d Cir. 1985); *Wood v. Artuz*, 39 F. Supp. 2d 211, 214 (E.D.N.Y. 1999); *cf. Taylor*, 484 U.S. at 415-16 ("Routine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those whose testimony will be offered at trial.").  Further, as the Michigan Court of Appeals found, although at the time of Jordan's testimony it was still an

44

open question whether Perry would be located in time to testify, counsel did not establish a foundation for her testimony during his cross-examination of Jordan.  The Michigan Rules of Evidence provide that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon[.]" MICH. R. EVID. 613(b).  Because a proper foundation was not laid, admission of extrinsic evidence of Jordan's statement through the testimony of Perry would not have been proper even if she had been located in time to testify.  *See People v. Parker*, 230 Mich. App. 677, 682-84, 584 N.W.2d 753, 756-57 (1998); *People v. Gendron*, 144 Mich. App. 509, 521, 376 N.W.2d 143, 149 (1985).

In these circumstances, petitioner cannot show that he was denied his right to present a defense by the failure of the trial court to grant an adjournment to locate petitioner or to strike Jordan's testimony.  Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3.    *DNA Testing of Darnell Riddle (Claim IV)*

Petitioner next contends that he was denied his right to present a meaningful defense by the trial court's failure to grant an adjournment so that DNA testing of Darnell Riddle could be completed.  As the court of appeals explained, the prosecutor did not consider Riddle a suspect because he had a confirmed alibi.  Nevertheless, a week before trial the prosecutor obtained a DNA sample from Riddle in light of the defense insinuation that Riddle should be a suspect.  At the time of trial the DNA testing was not complete.  On the first day of trial, defense counsel moved for an adjournment, in part so that the DNA testing could be completed, although counsel had not previously sought an order compelling DNA testing.  The trial court denied the motion to adjourn, concluding that there was not a sufficient likelihood that the DNA test would reveal relevant

information.  *See Coy II*, 258 Mich. App. at 20-21, 669 N.W.2d at 843-44.  Noting that "the police

are not required to test evidence to accord a defendant due process" and that "due process [does not]

require the prosecution to seek and find exculpatory evidence," *id*. at 21, 669 N.W.2d at 844 (citing

*Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)), the court of appeals rejected petitioner's claim.

The court reasoned:

> An adjournment is allowed only upon a showing of good cause and diligence.
> Defendant demonstrated neither: he was dilatory, and his exculpatory theory was
> highly speculative.  Although a slight chance exists that DNA testing may not have
> excluded Riddle as a possible contributor to the mixed DNA samples taken from the
> knife blade and the doorknob, Riddle had a corroborated alibi.  Nothing in the
> record suggests that DNA testing would have assisted defendant's case.  Moreover,
> defendant was entirely negligent with respect to his requests.  This Court decided
> *Coy*, *supra*, in November 2000.  Because defendant did not show the good cause or
> diligence necessary for an adjournment, the trial court did not abuse its discretion by
> denying defendant's motion to adjourn to accommodate his last-minute request to
> have Riddle's DNA tested.

*Coy II*, 258 Mich. App. at 22, 669 N.W.2d at 844 (citation omitted).  This determination likewise

was reasonable.

As the Michigan Court of Appeals correctly noted, the prosecution's failure to test Riddle's

DNA, or to do so prior to trial, does not alone provide a basis for relief.  The government in a

criminal prosecution "do[es] not have a constitutional duty to perform any particular test."

*Youngblood*, 488 U.S. at 59.  Thus, the failure to test Riddle's DNA does not alone amount to a

constitutional violation.  *See Jiminez v. New Jersey*, 245 F. Supp. 2d 584, 587-88 (D.N.J. 2003).  The

only question therefore is whether the trial court abused its discretion in refusing to grant a

continuance such that petitioner was thereby denied a fair trial.  Petitioner cannot make this

showing.

As with petitioner's claim relating to Jordan McKee's testimony, petitioner and his counsel

46

did not exercise diligence in seeking to obtain a DNA test of Riddle's blood. Petitioner was well aware of Riddle in the several year period between the crime and his retrial; indeed, at the first trial petitioner's counsel (who was the same as his counsel at retrial), attempted to paint Riddle as possible suspect and noted the absence of forensic testing on various pieces of evidence. *See* Trial Tr., Vol. V, dated 12/21/98, at 16-19 (testimony of Emily Whitehead, Riddle's parole officer); *id.*, Vol. VI, dated 12/22/98, at 35, 38, 41-42, 46-47, 49-51, 53, 55 (counsel's closing argument). At no point between the initial trial and the retrial did counsel request DNA testing of Darnell Riddle. Further, petitioner cannot show that he was prejudiced by the denial of a continuance. While the prosecution apparently never actually tested Riddle's DNA, it is petitioner's burden to demonstrate that he was prejudiced by the failure of the trial court to grant a continuance. Petitioner has not demonstrated that a DNA test of Riddle would have resulted in any exculpatory evidence–*i.e.*, that the result of the test would not have excluded Riddle as a possible contributor to the mixed samples. Indeed, petitioner never moved in the state courts for an order requiring such testing, either in the trial court or in the appellate courts. In the absence of any evidence of prejudice, and in light of petitioner's lack of diligence in securing testing of Riddle's DNA, it cannot be said that the trial court's denial of a continuance was an abuse of discretion which denied petitioner a fair trial. Accordingly, petitioner is not entitled to habeas relief on this claim.

D.      *Sentencing Claim (Claim V)*

Finally, petitioner contends that his sentence is excessive and constitutes cruel and unusual punishment. The Court concludes that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

In *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court held that the Eighth Amendment

47

requires that "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Id*. at 290. In considering whether a sentence is proportionate, the Court identified three objective factors which are relevant: "(I) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the same crime in other jurisdictions." *Id*. at 292. Applying this test to the facts before it, the Court found that the defendant's sentence of life imprisonment without possibility of parole under a habitual offender statute was disproportionate where the three underlying felonies were nonviolent crimes involving small sums of money, the final felony being for uttering a false check. *See id*. at 303.

However, the reach of *Solem* has been limited by the Supreme Court's more recent decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991). In *Harmelin*, the Court held that Michigan's mandatory sentence of life imprisonment for possession of over 650 grams of a controlled substance did not violate the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, reasoned that *Solem* was wrongly decided and should be overruled, and concluded that the Eighth Amendment contains no proportionality requirement outside the capital punishment context. *See Harmelin*, 501 U.S. at 965 (Scalia, J.). Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment contains a very narrow proportionality principle, which prohibits only those punishments which are "grossly" disproportionate to the crime. *See id*. at 1001 (Kennedy, J.). Further, Justice Kennedy's opinion distinguished *Solem*, essentially limiting application of the *Solem* objective criteria test to the facts in that case. *See id*. at 1001-05. Specifically, Justice Kennedy concluded that the objective analysis required in *Solem* is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of

gross disproportionality." *Id.* at 1005.[15]  Thus, it is unclear whether, and to what extent, *Solem*

remains good law.  *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) ("By applying a

head-count analysis, we find that seven members of the Court supported a continued Eighth

Amendment guaranty against disproportional sentences.  Only four justices, however, supported the

continued application of all three factors in *Solem*, and five justices rejected it.  Thus, this much is

clear: disproportionality survives; *Solem* does not.").

> As the Sixth Circuit has summarized,
>
> although only two Justices [Rehnquist and Scalia] would have held that the eighth
> amendment has no proportionality requirement, five Justices [Kennedy, O'Connor,
> and Souter, along with Rehnquist and Scalia] agree that there is no requirement of
> strict proportionality.

*United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991).  At most, then, the Eighth Amendment

"forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Harmelin*, 501

U.S. at 1001; *Hopper*, 941 F.2d at 422 ("the eighth amendment is offended only by an extreme

disparity between crime and sentence").  Thus, as a general matter,

> one could argue without fear of contradiction by any decision of [the Supreme] Court
> that for crimes concededly classified and classifiable as felonies, that is, as
> punishable by significant terms of imprisonment in a state penitentiary, the length
> of sentence actually imposed is purely a matter of legislative prerogative.

*Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Harmelin*, 501 U.S. at 962-65 (Scalia, J.); *id.* at

997-1001 (Kennedy, J.).

More recently, the Supreme Court again considered the proportionality issue under the

Eighth Amendment, resulting in a split similar to that reached in *Harmelin*.  In *Ewing v. California*,

---

[15]Justices White, Blackmun, Stevens, and Marshall all concluded that *Solem* should be upheld,
and the three-factor test applied to the sentencing scheme at issue.  *See Harmelin*, 501 U.S. at 1016
(White, J., dissenting).

538 U.S. 11 (2003), a three-justice plurality reaffirmed Justice Kennedy's approach in *Harmelin*, concluding that the Eighth Amendment contains a narrow proportionality principle which forbids sentences which are grossly disproportionate to the offense.  *See id*. at 23-24 (opinion of O'Connor, J.).  Justice O'Connor was joined in this position by Justice Kennedy, who had authored the plurality opinion in *Harmelin*, and by Chief Justice Rehnquist, who in *Harmelin* had joined Justice Scalia in concluding that the Eighth Amendment contains no proportionality requirement outside of the capital sentencing context.  Justice Scalia, now joined by Justice Thomas (who was not on the Court when *Harmelin* was decided), reaffirmed his view that the Eighth Amendment contains no proportionality guaranty.  *See id*. at 31-32 (opinion of Scalia, J.); *id*. at 32 (opinion of Thomas, J.). Justice Stevens likewise reaffirmed his view from *Harmelin* that the three-factor test of *Solem* guides the proportionality inquiry under the Eighth Amendment.  Justice Stevens was joined in this view by Justice Souter, who had joined the plurality opinion of Justice Kennedy in *Harmelin*, as well as by Justices Ginsburg and Breyer, who were not on the Court when *Harmelin* was decided.  *See id*. at 33-35 (opinion of Stevens, J.); *id*. at 35-37 (opinion of Breyer, J.).

Thus, although the particular Justices attached to each position have changed somewhat, the numbers and rationales in *Ewing* break down precisely as they did in *Harmelin*.  Thus, for purposes of habeas review, the Sixth Circuit's analysis of *Harmelin*, in which this Court asks only whether the sentence is grossly disproportionate to the offense, *see Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002); *United States v. Baker*, 197 F.3d 211, 217 (6th Cir. 1999), remains controlling under *Ewing*.

2.    *Analysis*

Petitioner mostly argues that the state courts incorrectly scored his offense under various

portions of the Michigan sentencing guidelines, and that his sentence was disproportionate under *People v. Milbourn*, 435 Mich. 630, 461 N.W.2d 1 (1990). The state sentencing guidelines and *Milbourn*, however, establish only rules of state law upon which habeas relief may not be premised. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.). Thus, petitioner is entitled to habeas relief only if his sentence is disproportionate under the Eighth Amendment standards discussed above.

Here, the "threshold comparison" of petitioner's crime and the sentence imposed does not "lead[] to an inference of gross disproportionality," *Harmelin*, 501 U.S. at 1005, and thus petitioner is not entitled to habeas relief on this ground. Petitioner was sentenced to a term of 20-30 years' imprisonment for voluntary manslaughter. As the Michigan Court of Appeals explained, "[t]he crime at issue was brutal. The victim sustained between twenty and twenty-five stab wounds. She sustained defense wounds on her wrists, and her eyes were blackened." *Coy II*, 258 Mich. App. at 23, 669 N.W.2d at 845. Further, petitioner had an extensive criminal record, consisting of three misdemeanor and two felony convictions, and had a history of substance abuse. *See id*. In these circumstances, a sentence of 20-30 years' imprisonment was not so grossly disproportionate to the offense to create an inference of unconstitutionality. *See Ramos v. Weber*, 303 F.3d 934, 937-38 (8th Cir. 2002) (life imprisonment for first-degree manslaughter); *cf. Lockyer*, 538 U.S. at 73-77 (upholding sentence of 25 years' to life imprisonment for theft under recidivist statute); *Ewing*, 538 U.S. at 28-30 (same). Accordingly, petitioner is not entitled to habeas relief on this claim.

## IV. ORDER

In view of the foregoing, the Court concludes that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable

51

application of, clearly established federal law.  Accordingly, it is ORDERED that petitioner's

application for the writ of habeas corpus is hereby DENIED.

                              s/Gerald E. Rosen_____
                              Gerald E. Rosen
                              United States District Judge

Dated:  February 15, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on
February 15, 2006, by electronic and/or ordinary mail.

                              s/LaShawn R. Saulsberry_____
                              Case Manager